## BODINE v. COMMISSIONER OF INTERNAL REVENUE.

### No. 6659.

Circuit Court of Appeals, Third Circuit.

April 4, 1939.

William R. Spofford and Dudley T. Easby, Jr., both of Philadelphia, Pa. (Ballard, Spahr, Andrews & Ingersoll, of Philadelphia, Pa., of counsel), for petitioner.

James W. Morris, Asst. Atty. Gen., and Sewall Key and Warren F. Wattles, Sp. Assts. to Atty. Gen., for respondent.

Thomas G. Haight, of Jersey City, N. J., and Robert H. Montgomery, of New York City, amici curiæ.

Before BUFFINGTON and BIGGS, Circuit Judges, and DICKINSON, District Judge.

BIGGS, Circuit Judge.

Upon January 5, 1928, the petitioning taxpayer applied to Sun Life Assurance Company of Canada for an agreement. This application was titled an "Application for a Life Annuity with Death Benefit". The amount of "death benefit" sought by it was $50,000. The sum of the "premium" was designated as $52,500, and the applicant desired an "annuity" to be paid to him monthly beginning upon February 9, 1928. The application set forth that the "death benefit" was to be paid to Fidelity-Philadelphia Trust Company, as trustee.

Upon January 7, 1928, the premium in the sum specified was paid by the taxpayer to the insurance company and a formal contract, agreement or policy was entered into and issued by the company to the taxpayer. This agreement or policy provided that the company would pay to the taxpayer $145.83 upon the ninth day of February, 1928, "* * * if the said annuitant be then alive and a like monthly payment on the ninth day of each succeeding month thereafter, during the subsequent lifetime of the said annuitant * * *." The agreement also provided that $50,000 as "the principal sum" with "* * * a proportionate part of the annuity payment for the fractional period between the date on which the last annuity payment becomes due and the date of the death of the annuitant * * *", or a sum equivalent to the premium of $52,500 less the sum of the annuity payments theretofore made, would be paid by the company to the trustee upon the death of the annuitant. The company also agreed that all "* * * annuity payments, including the proportionate payment on the death of the annuitant * * *", should be increased "* * * by such dividends as may be allotted by the Company out of its surplus interest earnings." The annuitant possessed the right, set forth in clause II of the policy, to surrender the policy for cancellation at any time, whereupon the company was obligated to pay to him the "principal sum" of $50,000.

In May, 1932, the taxpayer surrendered the policy for cancellation and received the sum of $50,000. Prior to the surrender of the policy the taxpayer had received by way of monthly payments, including monthly participation in profits, for fifty-one months, the total sum of $11,383.21. The taxpayer had considered that items constituting this sum were annuity payments and therefore did not include them in his income tax returns for the respective years in which they were paid to him by the company. In his income tax return for the calendar year 1932, however, the taxpayer reported a capital net loss of $85,751.22 which he obtained by reducing the amount of capital losses reported, viz., $94,634.43, by the amount of capital gain, viz., $8,883.21, achieved by the surrender of the policy to the insurance company. He determined the cost of the policy for income tax purposes to be $41,116.79, or the sum of the premium paid, viz., $52,500, less the aggregate amount of $11,383.21 paid to him in the monthly payments we have referred to. In short, upon his 1932 return the taxpayer reported a taxable net gain of $8,883.21, he having held the policy from January 7, 1928.

The Commissioner, however, eliminated the gain of $8,883.21 from capital gain

as the taxpayer had reported it, and included gain in this amount as ordinary income subject to both normal tax and surtax.

It follows that the questions presented for our determination are twofold and may be stated as follows: First, were the sums which the taxpayer received periodically with the sum of $50,000 in 1932 from the company pursuant to his agreement or policy "amounts received * * * under a life insurance, endowment, or annuity contract * * *" within the meaning of Section 22(b) (2) of the Revenue Act of 1932, 26 U.S.C.A. § 22 note? Second, if these sums should be thus categorized, should they be treated as ordinary income to the taxpayer taxable as such or should the sum of $8,883.21 be deemed to be capital net gain and therefore taxable pursuant to the provisions of Section 101(c) of the Revenue Act of 1932, 26 U.S.C.A. § 101 note?

Section 22(b) (2) of the Revenue Act of 1932, c. 209, 47 Stat. 169, 178, exempts from taxation "Amounts received * * * under a life insurance, endowment, or annuity contract * * *" but further provides that "* * * if such amounts (when added to amounts received before the taxable year under such contract) exceed the aggregate premiums or consideration paid (whether or not paid during the taxable year) then the excess shall be included in gross income."

■ Were the amounts received by the taxpayer beginning in February, 1929, and ending in May, 1932, "Amounts received * * * under a life insurance, endowment, or annuity contract * * *" within the meaning of the words of the statute quoted? Now it is obvious that a label placed upon an agreement by the parties thereto need not be determinative of its character. Stearns Co. v. United States, 291 U.S. 54, 61, 54 S.Ct. 325, 78 L.Ed. 647; Aluminum Castings Co. v. Routzahn, 282 U.S. 92, 99, 51 S.Ct. 11, 75 L.Ed. 234. Neither may it be contended that because the taxpayer treated the monthly payments received by him under the contract as annuity payments for income tax purposes that that fact is binding upon him now. We must regard the substance of the transactions and not their form.

■ The word "annuity" has been variously defined. Bouvier's Law Dictionary Vol. 1, Rawle's Third Revision, p. 201, describes an annuity as "A yearly sum stipulated to be paid to another in fee, or for life or years, and chargeable only on the person of the grantor." This definition is the common law definition. See In re Smathers' Will, 133 Misc. 812, 234 N.Y.S. 99, and In re Kohler, 96 Misc. 433, 160 N. Y.S. 669, 675. 1 Words and Phrases, Fourth Series, p. 164, describes an annuity as, "* * * a stated sum per annum payable annually, unless otherwise directed. It is not income or profits, nor indeterminate amount varying according to the income or profits, though a certain fund may be provided out of which it is payable", citing Town of Hartland v. Damon's Estate, 103 Vt. 519, 156 A. 518, 523. Words and Phrases also describes the term annuity as being "* * * generally understood as an agreement to pay a specified sum to the annuitant annually during his life", citing State ex rel. Thornton v. Probate Court of Ramsey County, In re Thornton's Estate, 186 Minn. 351, 243 N.W. 389, 391. Webster's New International Dictionary defines it as "An amount, especially of money, payable yearly for a certain or uncertain period, as for years, for life, or in perpetuity * * *". Funk & Wagnalls Concise Standard Dictionary defines annuity as "An annual allowance or income". The Encyclopaedia Britannica, Eleventh Edition, describes an annuity as "* * * a periodical payment, made annually, or at more frequent intervals, either for a fixed term of years, or during the continuance of a given life, or a combination of lives." The authority referred to also states, "An annuity depending on the continuance of an assigned life or lives, is sometimes called a life annuity; but more commonly the simple term 'annuity' is understood to mean a life annuity, unless the contrary is stated. A life annuity, to cease in any event after a certain term of years, is called a *temporary annuity.*" The word annuity "* * * has been the cause of puzzlement of mind, and there is a wealth of embarrassment in the decisions of the courts." 3 C.J.S., Annuities, § 1, p. 1373.

■ In our opinion an annuity may be described as a sum paid yearly or at other specified intervals in return for the payment of a fixed sum by the annuitant. The annuity itself is the totality of the payments to be made under the contract. Under the terms of the contract sub judice a monthly payment was contemplated to

be paid to the annuitant until the death of the annuitant or the surrender of the policy by him. The contract under consideration therefore possesses dual characteristics. It is a life annuity in that it was terminable by the death of the annuitant and was a term annuity since it was terminable by the voluntary action of the annuitant. The whole of the sums paid by the insurance company to the taxpayer, including the monthly payments and the principal sum of $50,000, constitute the totality of the annuity. But the contract is not only a contract of annuity, it also possesses characteristics of a single premium straight life insurance contract. Most, if not all, of the characteristics of the contract lie within the two categories named and we are therefore of the opinion that the sums paid by the company to the taxpayer are within the purview of Section 22(b) (2).

In reaching this conclusion we are not unmindful of the contentions of the taxpayer to the effect that the contract between the taxpayer and the insurance company simply was one providing for the deposit of a fixed principal sum, payable to the depositor upon demand or at death with a guaranteed return upon the investment of $3\frac{1}{2}\%$ and additional sums by way of interest upon the taxpayer's investment as the insurance company allotted dividends from surplus interest earnings. We think, however, that this contention of the taxpayer cannot be supported upon the facts. The sum of $52,500 was not deposited with the insurance company; it was paid to that company by the taxpayer. The obligation of the insurance company was not to return $52,500, but to return a "principal sum" in the amount of $50,000. No interest designated as such was to be paid upon the sum paid by the taxpayer to the insurance company. As a matter of fact the monthly return of $145.83 contracted to be paid by the company to the taxpayer is $3\frac{1}{2}\%$ upon the principal sum of $50,000, and the sums payable monthly to the taxpayer by the company above the stipulated sum of $145.83 were dependent upon the allotment of dividends by the company from earnings. The transactions between the taxpayer and the insurance company bear only superficial resemblance to a deposit of money with a banking institution with interest payable at a fixed rate and the amount of the deposit repayable on demand.

Nor are we persuaded to a contrary conclusion by the reasoning embraced in the two decisions upon which particular emphasis is laid by the taxpayer, viz., State ex rel. Thornton v. Probate Court of Ramsey County, In re Thornton's Estate, 186 Minn. 351, 243 N.W. 389, and Ballou v. Fisher, 154 Or. 548, 61 P.2d 423.

In the Thornton case the Supreme Court of Minnesota had before it the question of whether or not beneficiaries under three contracts entered into by one Thornton with insurance companies took their rights upon the death of Thornton subject to the Minnesota Succession Tax. Thornton had paid $30,000 to each company and the companies respectively agreed to pay Thornton annually a specified sum beginning with the year 1932. The Supreme Court of Minnesota states [186 Minn. 351, 243 N.W. 390], "Besides these annuities, the companies agreed that, during Thornton's lifetime, there would be guaranteed earnings on the sums paid in equal to $3\frac{1}{2}$ per cent., and that he would be paid such additional amount as might be allocated to him by the board of directors of each company out of interest earnings in excess of $3\frac{1}{2}$ per cent." The beneficiaries under these contracts after Thornton's death claimed that the contracts were insurance contracts and therefore not subject to taxes imposed by the Succession Tax Laws of Minnesota. See Section 3410, Mason's St.1927. The Court also stated that it was of the opinion that the sum paid by Thornton for the contracts " * * * stands precisely in the same relation to him as if he had deposited that amount in a bank under a contract * * *. There would be an obligation to pay the whole sum paid or deposited to him, if demanded in his lifetime, and to appointed beneficiaries upon his death."

Thornton during his lifetime had the right to demand and receive the sums paid by him to the insurance companies. Upon his death, the beneficiaries had such right. We should point out that in the cited case there were no payments made pursuant to the contracts to Thornton because he died before they were due. In its opinion the Supreme Court of Minnesota makes frequent use of the word "annuity" and the phrase "annuity payments". In arriving at the conclusion that the succession was taxable the Court, referring to the difference between Thornton's contracts and insurance contracts, stated: " * * *

technically these contracts are not insurance policies, and cannot escape the tax as such. They are, to say the least, annuity contracts. Decisions as well as statutes make a distinction between the two. * * * It may be here added that the contracts in the case at bar are more than annuity contracts. There is some risk as in insurance connected with the latter. The company stands to gain if the annuitant should die before he attains his expectancy age, and to lose if he long survives such age; whereas under these contracts the amount paid in or deposited is always for the use and at the disposal of the one who paid it as long as he lives and passes to the beneficiaries at his death."

We are not in accord with the decision of the Minnesota Supreme Court in its holding that the contracts in the Thornton case were not insurance contracts, though we concur in the statement heretofore quoted that Thornton's contracts were at least annuity contracts. We are not in accord with the statement that these contracts were more than annuity contracts in so far as the court deemed them to be contracts for the deposit of funds. In our opinion the Minnesota Court placed too great an emphasis upon the element of risk which it stated must be inherent in annuity contracts as in insurance policies. Annuities existed long before insurance policies and at common law frequently contained no element of risk whatsoever. Originally they were sums chargeable upon a person for the benefit of another; later they were charges upon specific lands payable to an individual. Frequently sums were chargeable against a specific estate payable yearly for the benefit of an annuitant, with the further provision that upon the death of the beneficiary the estate charged reverted freed of the charge to the grantor and his heirs. Moreover, an element of risk is clearly apparent to the insurance company under the terms of its contract with Thornton. So long as Thornton lived and so long as he desired, the company was compelled to pay him the stipulated annuity. The longer Thornton's life, the greater the sum the insurance company would be compelled to pay to him unless he surrendered the policy. In our opinion therefore the contracts in the Thornton case possessed most of the characteristics of annuity contracts. In our opinion these contracts were combination annuity and single premium straight life insurance contracts.

In Ballou v. Fisher, supra, the Supreme Court of Oregon had before it a question almost similar to that presented for determination in the Thornton case. Ballou had purchased from an insurance company two "Participating Life Income Policies" and had paid $26,250 for one and $21,000 for the other. The consideration paid was divided between life annuity premiums and life insurance premiums. During the years 1932 and 1933 Ballou received certain sums of money on account of the policies from the insurance company. These sums were allocatable respectively to "guaranteed annuity", "annuity dividend" and "life insurance dividend". The specific question presented was whether or not these moneys were exempt under the Oregon Intangibles Income Tax Act of 1931, by reason of the provisions of Section 8, c. 335, p. 576, Oregon Laws of 1931. It should be stated that subsection (b) of Section 8 of the Oregon Act is very similar in its provisions to Section 22(b) (2) of the Federal Act, and provides that amounts received by the insured as "a return of premium or premiums paid by him" under life insurance, endowment, annuity or interinsurance contracts shall be exempt from taxation upon the same terms as are provided by Section 22(b) (2).

In the cited case Ballou contended that his contracts were within the category enumerated by the Oregon statute and that the amounts received by him constituted in fact the return of premiums. The tax authorities urged the contrary view. Each policy contained a provision that the insurance company would pay the principal sum named (in the case of the smaller policy the sum of $20,000) to the beneficiaries upon proof of the death of Ballou.

In its decision the Supreme Court of Oregon, after referring to the rule that a statute granting an exemption from taxation must be construed strictly, stated [154 Or. 548, 61 P.2d 425], "A contract which provides for a return of the consideration paid is not a life insurance or annuity contract", citing Chisholm v. Shields, 67 Ohio St. 374, 66 N.E. 93, 94, and thereupon held the sums paid to Ballou by the insurance company subject to taxation under the Oregon Act.

The facts of the Ballou case possess few distinguishing features from those of

the case at bar. It should be pointed out, however, that Section 8 of the Oregon Act qualifies the phrase *amounts received* by the insured with the phrase "as a return of premium or premiums paid by him"; whereas Section 22(b) (2) of the Federal Act referred simply to *amounts received,* and the qualifying phrase is omitted. If the omission of this qualifying phrase from the Federal Act possesses any effect however it serves to weaken the authority of the Ballou case in its application to the case at bar, for premiums are not returned under an annuity contract. The label placed by parties to a contract upon incidents contemplated by the contract does not possess much weight. We conclude therefore that the Ballou case is practically upon all fours with the case at bar. But in the Ballou case as in the Thornton case in our opinion the court lays too great an emphasis upon the fact that the annuitant assumed no risk in view of the fact that during his life the principal sum was payable to him upon his demand. But, as in the Thornton case, there is a risk to the insurance company since it was compelled to pay to Ballou the sum of the stipulated annuity so long as Ballou might live. In our opinion therefore the contracts in the Ballou case combined the characteristics of annuity contracts and single premium straight life insurance contracts.

It follows therefore that the sum received by the petitioner in the case at bar in excess of $52,500, the cost of the policy, viz., $8,883.21, was taxable under the provisions of the Federal statute cited.

The remaining question presented for our determination is whether or not the sum last referred to should be taxed as net capital gain or should be subject to taxation as ordinary income of the taxpayer. The term "capital gain" as used in Section 101 of the Revenue Act of 1932 according to the definition means "* * * taxable gain from the sale or exchange of capital assets * * *." We think it is entirely clear that the sums received by the taxpayer from the insurance company were not received by virtue of the sale or exchange of capital assets. See Hale v. Helvering, 66 App.D.C. 242, 85 F.2d 819, 821; United States v. Fairbanks, 9 Cir., 95 F.2d 794; Felin v. Kyle, 3 Cir., 102 F.2d 349. Moreover, the provision of Section 22(b) (2) is entirely clear and explicit that the excess "* * * shall be included in gross income". This precludes

treatment of the excess as capital net gain. We therefore conclude that the result of the transactions between the taxpayer and the insurance company was the receipt of ordinary income to the taxpayer in 1932 in the sum of $8,883.21 and it was taxable as such.

Accordingly the decision of the Board of Tax Appeals is affirmed.

DICKINSON, District Judge, dissents.